## Douglas et ux. v. Clarke.

*Frank M. Hunter,* for plaintiffs; *Clarence G. Myers,* for defendant.

MACDADE, J., Nov. 1, 1929.—The plaintiffs have instituted a suit in equity and had the same marked as a case *lis pendens* against the defendants, setting up, *inter alia,* that they own certain premises in the Borough of Swarthmore, upon which, facing toward Chester Road and running near or along the northwest boundary of said premises (lot), is located a three-story, fifteen-room dwelling-house, modern in design and of tile and stucco construc-

tion, in which plaintiffs reside. That to the rear of said dwelling and on the premises aforesaid is a private garage and near the northwest corner is a spring-house. To the southwest of said dwelling, lying between said dwelling and said Swarthmore Avenue and located on said premises, is an artificial lake or pond constructed and maintained by said plaintiffs for the beautification of their premises and for the æsthetic pleasure of the plaintiffs and their families and guests. The remaining portion of said premises is improved and beautified by a private curving driveway, a lawn, shrubs, trees, vines and other ornamental growth and foliage. The premises are enclosed on its Chester Road and Swarthmore Avenue frontages with a privet hedge. The said lake or pond is about 85 feet long, 45 feet wide and 2½ feet deep at the breast of the dam. Plaintiffs' land surrounding said lake or pond slopes downward on all sides toward it, said Swarthmore Avenue distant from said lake about 20 feet, being approximately 4 feet above the level of the water of said lake or pond at the breast of the dam. Said lake or pond is fed by a rivulet or small and narrow open watercourse, which crosses under Swarthmore Avenue and enters near the northwest corner of plaintiffs' premises. The said lake or pond has an outlet, thus precluding stagnation of its water.

All of the premises and all improvements and things thereon, as hereinbefore set forth, are at all times maintained in a cut, trimmed and otherwise well-kept condition, and constitute to plaintiffs, their family and guests, a dwelling-place conducive at all times to comfort, repose, beauty and enjoyment.

The present market value of plaintiffs' premises, with the improvements thereon, is in excess of $45,000.

Defendant, William A. Clarke, is the owner of a large tract of land, containing in excess of eleven acres, abutting on its northerly side on Baltimore Avenue, otherwise known as Baltimore Pike; on its northwesterly side on Cedar Lane; on its southwesterly side on Swarthmore Avenue, and its southeasterly side on the rear or northwest boundary-line of plaintiffs' land and the northwest boundary-line of other properties northeast of plaintiffs' residence running along the northwest side of Chester Road.

The defendant's said tract has been recently annexed to the Borough of Swarthmore.

Prior to defendant's activities hereinafter stated, defendant's entire tract was vacant and unimproved, and by reason of its natural topographic and other conditions, much of rain or other surface-water coming thereon was absorbed by defendant's ground. A material portion of such surface-water not so absorbed drained on to properties other than plaintiffs' property abutting the southeast side of defendant's land. Also, a road-drain led into defendant's land from Baltimore Avenue near the line of Sproul Road projected, discharged its water on defendant's land upwards of 1000 feet distant from the nearest point of plaintiffs' said premises, and the water thus discharged on defendant's land was either absorbed thereon or drained into properties other than that of your complainants.

The entire suface and other drainage-water naturally received by plaintiffs' said premises was small in quantity, distributed over its entire boundary-line and insufficient in volume to create inconvenience, discomfort or interruption in the full enjoyment of plaintiffs' said premises or adversely affect the market value thereof.

On or about April 10, 1928, a plan was prepared, laying out and dividing the said tract of land into about thirty-four parcels of lots and providing for a system of streets of extensive area running through said land, with open-

ings on to said Baltimore Avenue, on Cedar Lane and at or near the intersection of Swarthmore Avenue and Cedar Lane. Said plan is not recorded, but a substantially true and correct sketch thereof is attached to plaintiffs' bill of complaint.

On or about May 1, 1929, defendant, through his agents, employees and contractors, began development of said tract of land according to said plan, including laying out, grading and curbing of the hereinbefore referred to system of streets, and side streets are now graded and curbed, and defendant is proposing to complete the same with modern street pavement. Three dwelling-houses are in course of construction on said tract and plaintiffs believe that many more dwelling-houses are proposed to be constructed on said tract of land.

On or about May 1, 1929, aforesaid, defendant, through his agents, employees and contractors, began construction of a sewer system for the drainage of storm, surface, drain, roof and other water from the said streets, lots and houses located and to be located in defendant's said tract of land. The said sewers have been constructed in the bed of said new streets with inlets leading into said sewers and located in the gutter or beds of said streets at defined locations.

All of such sewers lead into a main or trunk sewer of a diameter of approximately thirty inches.

In the progress of the development of said tract, defendant, through his officers, agents and employees, graded or otherwise changed the natural and immediately pre-existing topography and condition of said land by embanking, raising or elevating the land adjacent to certain portions of its southwesterly boundary-line to the northeast of plaintiffs' land, thereby diverting large quantities of water which theretofore from time to time naturally flowed from defendant's land to said abutting properties fronting on Chester Road and northeast of the plaintiffs' land into the streets, gutter and sewers hereinbefore mentioned.

On or shortly prior to May 14, 1929, defendant, through his agents, employees and contractors, began the laying of said thirty-inch main or trunk sewer along the line of Swarthmore Avenue and within the southwest boundary-line of defendant's said tract and extending in a southeasterly direction toward the northwesterly corner of plaintiffs' said land, with the obvious purpose and intent of discharging the entire flow of said sewer system into a small rivulet or watercourse running into plaintiffs' lake or pond hereinaforementioned. Plaintiffs notified defendant to cease and desist from any such construction, purpose and intent by a written communication addressed to Clarke and Harvey, Inc., dated May 14, 1929, and duly received by defendant. A true and correct copy of said letter is attached to the said bill of complaint.

After receipt by defendant of the notice, defendant ceased and desisted from the proposed construction of the said sewer to said rivulet or watercourse, but, after an interval of several weeks, to wit, in the latter part of June or the early part of July, 1929, the exact date to the plaintiffs being unknown, defendant, through his agents, employees and contractors, began the construction of a terminal pit, chamber or vault and to connect or lead the said thirty-inch main sewer thereinto, so as to discharge the entire content of said drainage, surface, storm and roof-water system into said terminal pit, chamber or vault.

Said terminal pit, chamber or vault is approximately 4 feet long, 5 feet wide and 8 feet deep. Its bottom and sides are of brick and cement or other hard, solid and lasting construction, and no outlet pipe leads therefrom. Said pit,

chamber or vault is located on defendant's said tract of land abutting the northeast side of Swarthmore Avenue and distant approximately 150 feet from plaintiffs' said premises. Said pit, chamber or vault has a solid iron or other metal covering on the top thereof. The only opening in said terminal pit, chamber or vault for the discharge of the water emptied therein is an opening running along the entire length of the vault fronting on Swarthmore Avenue, and said opening is elevated above the level of Swarthmore Avenue and is so designed, arranged and constructed that the entire discharge of water from said terminal pit, chamber or vault will be directed on to the roadway surface of said Swarthmore Avenue.

Said Swarthmore Avenue, from the place where the water from said terminal pit, chamber or vault will be discharged on it, slopes downward toward plaintiffs' said premises. Said Swarthmore Avenue has no storm or surface-water or other water-drainage sewers in or along the portion of said highway between said point of discharge from said terminal pit, chamber or vault and the intersection of said Swarthmore Avenue with said Chester Road. The grade, location and construction of said Swarthmore Avenue is such that all or the greater portion of the water discharged from said pit, chamber or vault will flow on or along said Swarthmore Avenue and thence into, on and over plaintiffs' said premises.

By reason of the design, character, size, location, construction, operation and function of defendant's said sewer system, including said terminal pit, chamber or vault, surface, storm, street, roof drainage and other waters falling or otherwise coming on to said defendant's said entire tract will be collected at one point, to wit, the said terminal pit, chamber or vault, and discharged in vast quantities, frequent in recurrence, on said Swarthmore Avenue and thence into, on and over plaintiffs' hereinbefore-described premises. Also, by reason thereof, large quantities of sand, dirt, gravel and debris will be washed on to plaintiffs' said premises.

All of the said streets, gutters, sewers and the said terminal pit, chamber or vault are laid out, located, constructed on, owned by and at the expense of said defendant and on defendant's said tract of land.

The discharge of such water from said defendant's sewer system on to plaintiffs' said premises, as hereinbefore averred, will be repeated, recurring and continuing and will occasion and cause great, recurrent and irreparable injury, damage and destruction to plaintiffs' said premises, and injury, interruption, interference, damage and destruction to, of and with plaintiffs' use and enjoyment of the said premises and greatly diminish the market value of the said premises.

While said terminal pit, chamber or vault was under construction and when defendant's purpose and intent to plaintiffs first became apparent, to wit, in the latter part of June or the early part of July, plaintiffs orally notified defendant of the injury, damage and destruction to plaintiffs' said premises necessarily consequent upon defendant's said proposed construction, and notified defendant to cease and desist therefrom, but thereafter, notwithstanding said notice of plaintiffs, defendant proceeded with the proposed construction of said terminal pit, chamber or vault with the purpose and intent to discharge such water on to said Swarthmore Avenue and thence on to plaintiffs' said premises as hereinbefore more particularly described.

On or about June 17, 1929, defendant, through his employees, agents or contractors, dug and now maintains an open ditch through a portion of defendant's premises leading in a southerly direction to a point at or near the boundary-line of defendant's property and laid out on such a slope that great

quantities of water from defendant's premises are recurrently gathered in said ditch and recurrently discharged with mud and debris on plaintiffs' said premises and to the damage, injury and destruction of the use, comfort and enjoyment of such premises.

The prayers are:

1. That defendant, his agents, employees, contractors and any and all persons, firms, associations or corporations hereafter purchasing lots or parcels of land in defendant's said tract or purchasing all of said tract be severally enjoined, commanded and restrained from gathering and collecting, or permitting to be gathered and collected, any surface, storm, roof, drain or other water falling or coming on to said tract of land, or any portion thereof, and discharging it, either directly, either through the ditch in paragraph 18 of this bill described or discharging it in any other wise, in, on, upon or over plaintiffs' said premises, or at any other place or location, in such manner that the same will flow over the surface of the ground or other place, into, on to or over plaintiffs' said land.

2. That defendant, his agents, employees, contractors and any and all persons, firms, associations or corporations hereafter purchasing lots or parcels of land in defendant's said tract, or purchasing all of said tract, be severally enjoined, commanded and restrained from causing and permitting surface, storm, roof, drain and other water falling or coming on to said land and gathered and collected in said terminal pit, chamber or vault from being discharged out of said pit, chamber or vault on to the surface of Swarthmore Avenue or on the surface of land adjacent thereto, so as to flow on, upon, into or over plaintiffs' said premises.

3. That defendant, his agents, employees, contractors and any and all persons, firms, associations or corporations purchasing lots or parcels of land in defendant's said tract, or purchasing all of said tract, be severally enjoined, commanded and restrained from causing or permitting surface, storm, roof or other water falling or coming on to said land to be discharged, emptied, collected or gathered, either directly or indirectly, into said terminal pit, chamber or vault until adequate and sufficient measures have been constructed, installed or completed to carry off the water so discharged, emptied, collected and gathered in such a manner as to insure against its flowing or coming in, upon or on plaintiffs' said premises.

3. That a mandatory injunction be granted upon final hearing demanding defendant to take away and remove the said ditch as well as change the arrangement, design, construction and outlet of said terminal pit, chamber or vault, and otherwise to correct, make, furnish and supply adequate means to insure against the surface, storm, roof and drain-water on defendant's said tract from flowing on to plaintiffs' premises.

4. That such other equitable relief be granted as to your Honorable Court will seem meet and proper, including compensation for any and all damages by complainant sustained.

To this bill of complaint the defendant has filed an answer, setting forth preliminary objections as follows:

"1. It appears from a reading of plaintiffs' entire bill and the attached exhibits that the basis of their complaint is that the defendant, in laying out streets through his tract of ground on a hill or slope above plaintiffs' ground, grading his lots to drain into said streets and installing a storm sewer or drain from said streets to a public highway of the Borough of Swarthmore which abuts both plaintiffs' and defendant's property, has caused an increased flow of surface-water on to said public highway, along which it naturally

flows, down to a point opposite plaintiffs' property, where it enters existing drains (not constructed by the defendant) leading off said highway into a small creek or watercourse crossing plaintiffs' property.

"2. The plaintiffs are seeking equitable relief from the natural consequences of owning land at the foot of a hill or slope through which flows a creek or watercourse forming the natural outlet of storm and surface-water of the said hillside and adjoining land.

"3. The bill amounts to a complaint that defendant has improved his formerly vacant and unimproved land, which has recently been annexed to the Borough of Swarthmore.

"4. It appears from paragraph 12 and succeeding paragraphs of plaintiffs' bill that defendant has merely drained the surface-water naturally flowing upon or across his land into newly-opened streets, from which it is conducted by a drain to the roadbed of Swarthmore Avenue, a public highway, at a point 150 feet or more distant from plaintiffs' property.

"5. It appears from paragraph 13 and succeeding paragraphs of plaintiffs' bill that the flow of surface-water into the creek or watercourse on the plaintiffs' premises is due to the natural slope or grade of Swarthmore Avenue and the absence of adequate gutters or curbs on Swarthmore Avenue, for which conditions defendant is in no way chargeable.

"6. It appears from the averments of paragraphs 2, 10, 11 and Exhibit 'B' of plaintiffs' bill that plaintiffs' property is a servient tenement situated at the bottom of a natural slope or drainage area, and that a natural creek, rivulet or watercourse has for an indeterminate time flowed through and across plaintiffs' property, carrying away storm-water from said drainage area, including defendant's property, higher up on the hillside.

"7. It appears that defendant, in common with other owners of land located above defendant's land, has an easement for the flow of storm and surface-water across plaintiffs' property.

"8. Plaintiffs' bill does not aver that defendant has unduly, unreasonably or improperly increased the flow of surface-water ultimately reaching the creek or watercourse on plaintiffs' premises.

"9. Plaintiffs' bill does not aver that defendant's improvements have been constructed in a careless or negligent way or that same are in any respect improper or unreasonable under the circumstances set forth.

"10. It appears from the bill that there are no public storm sewers or other means of taking care of the surface, stream, roof, drain or other waters falling or coming on to defendant's tract of land other than the natural down-hill flow from defendant's street to Swarthmore Avenue to the creek on plaintiffs' property at the foot of the hill.

"11. Plaintiffs' bill does not aver that defendant could have constructed his said surface-drainage system, including the covered terminal pit or vault at the curb-line of Swarthmore Avenue, 150 feet above plaintiffs' property-line, in any other or more appropriate manner than he has done or could dispose of his natural surface-water in any other manner, there being no municipal or other storm sewers to discharge into.

"12. It appears from plaintiffs' entire bill that defendant has merely taken the customary and usual steps of a property owner in developing his land for urban purposes and in the orderly disposition of storm and surface-water.

"13. It appears that the ditch complained of in paragraph 18 of plaintiffs bill was merely a temporary expedient, and defendant's comprehensive plan contemplates the effective drainage of his lots into the abutting streets and public highways, as elsewhere averred in the bill.

"14. The plaintiffs seek, in paragraphs 1, 2 and 3 of their bill, the total cessation of all flow of surface-water on to plaintiffs' property, although plaintiffs admit in the last part of paragraph 5 and in Exhibit 'B' of their said bill that their land has always received surface-water from defendant's tract. The said admission in Exhibit 'B' is as follows: '. . . In the past our property has received some water from your field, but under present conditions the flow you are arranging to direct over our property cannot be taken care of without considerable damage.'

"15. The plaintiffs seek in the 4th paragraph of the prayer of their bill (inadvertently numbered 3) to fasten upon the defendant the liability of an insurer 'against the surface storm, roof and drain-water on defendant's tract from flowing on to plaintiffs' said premises.'

"16. The plaintiffs' difficulties arise from the insufficient size of the outlet pipe (sixteen inches, according to letter of James B. Douglas attached as Exhibit 'B' of the bill) installed on their premises in connection with the artificial dam and lake improvements constructed by them in the bed of a natural watercourse across their property.

"17. The damage anticipated by the plaintiffs is not to their land, but to certain artificial improvements constructed by them in and about a lake or pond formed by damming up the creek or watercourse flowing through their said premises and installing a sixteen-inch outlet therefor.

"18. The damage anticipated by the plaintiffs results from the topography of the neighborhood, the fact that Swarthmore Avenue, down which the storm-water will flow, is elevated four feet above plaintiffs' artificial lake or pond, is uncurbed and that old drains lead therefrom into the watercourse on plaintiffs' property. It is not alleged defendant caused or is in any way responsible for this situation.

"19. It does not appear that plaintiffs have taken any steps to lawfully protect their property from the flow of surface-water or prevent the overflow of surface-water from the roadbed of Swarthmore Avenue, which at present is uncurbed opposite plaintiffs' property.

"20. It is apparent that the relief sought by the plaintiffs cannot be granted without working irreparable injury and disproportionate hardship on the defendant, whereas plaintiffs have taken no steps to accommodate their artificial improvements and inadequate artificial outlet to the natural increase of surface-water attendant upon the orderly growth and development of the Borough of Swarthmore and the reasonable improvements being made by the defendant on his premises.

"21. It appears that the plaintiffs have an adequate remedy at law.

"22. If plaintiffs have been damaged by the defendant's operations or the grade of abutting streets, their remedy is not in equity but the statutory remedy of proceedings before a jury of view, or relief from the proper municipal authorities for storm-water drainage.

"Wherefore, the defendant prays that the plaintiffs' bill be dismissed at the cost of the plaintiffs and that the relief therein prayed for be denied."

If this were a bill in equity to restrain defendant from permitting deposits of earth, etc., to wash from his land upon plaintiffs' adjoining lot and the evidence disclosed that both properties were on a slope and received the natural drainage of the hillside, and defendant improved his land by laying it out in lots, streets and walks, to support some of which a fill was required and the surface drainage carried soil from the hill upon plaintiffs' adjoining premises and there was no negligence on the part of the defendant in making the improvements, under such circumstances, the damages sustained by the plain-

tiffs would be 'damnum absque injuria and it would be proper for us to dismiss the bill: Tess v. Charleroi Home Building Co., 96 Pa. Superior Ct. 505.

But although a defendant is not liable to a property owner (plaintiffs herein) for the increase flow of surface-water over or on to his property, arising merely from the changes in the character of the surface produced by the *opening of streets or building of houses* in the regular and ordinary course of expansion, a defendant, diverting the flow of surface-water so that it accumulates and flows upon abutting property where it would not naturally flow, is liable to the abutting owner in damages for the resulting injury: Meninchino v. City of New Castle, 96 Pa. Superior Ct. 405.

The defendant's answer raises preliminary objections under Rule 48, subdivisions 6 and 7, which are as follows:

"(6) That upon the facts averred, plaintiff has a full and adequate remedy at law;

"(7) That for any other reason, defendant should not be required to answer the facts averred, since he has a full and complete defense to plaintiffs' claim, specifically stated, which does not require the production of evidence to sustain it."

The question to be decided is not whether the complaint is so clear in both form and substance as to entitle plaintiffs, without amendment, to proceed to trial, but whether, under the facts averred, it shows as a question of law that plaintiffs are not entitled to recover: Gray v. Phila. & Reading C. & I. Co., 10 D. & C. 400, 23 Schuyl. Legal Rec. 7 (1926). The same rule is thus expressed in Hershey et al. v. Brotherhood's Relief and Compensation Fund, 9 D. & C. 167, 31 Dauphin Co. Reps. 51, that an answer raising the question of the sufficiency of the averments in a bill in equity is not within the purview of subdivision 7 of Equity Rule 48, inasmuch as that rule contemplates a defense to the claim and not an allegation of the weakness or insufficiency of the averments of the bill to sustain the action. Precisely to the same effect is Goldstein v. Goldstein, 7 D. & C. 356.

Another principle pertinent to the instant case is that preliminary objections to a bill in equity cannot be based on matters extraneous to the matters contained in the bill: Paris v. Reichard, 10 D. & C. 165; Wettengel v. Robinson et al., 74 Pitts. L. J. 325.

Both of these principles are ignored in defendant's preliminary objection. Many of the objections are predicated on alleged weakness or insufficiency of the averments in plaintiffs' bill and on matters extraneous to those contained in plaintiffs' bill.

Another principle of pertinent application is that, as to the character of objections, Equity Rule 48 must be construed in the same way as similar objections to plaintiffs' statement of claim under the Practice Act of May 14, 1915, P. L. 483 (Gray v. Phila. & Reading C. & I. Co., 286 Pa. 11), and it would seem to clearly follow that for the purposes of the case, plaintiffs' averments of fact must be accepted in all respects as true. Finally, the principle of Strizakv. Danacko, 11 D. & C. 150, 25 Sch. Leg. Rec. 97 (1929), is to be borne in mind, to wit, that a bill in equity should not be dismissed because of objections under Equity Rule 48, unless the facts averred show that the plaintiffs cannot possibly recover: Rutherford Water Co. v. Harrisburg, 297 Pa. 33.

Is the instant case such that under the averred facts of the bill of complaint the plaintiffs cannot possibly proceed in equity?

To induce equity to refuse its aid to a suitor, it is not sufficient that he may have some remedy at law. Unless the remedy at law is as full, complete and adequate as equity would give to plaintiffs, the chancery jurisdiction will be

sustained: Pennsylvania R. R. Co. *v.* Bogert, 209 Pa. 589; Apollo Trust Co. *v.* Safe Deposit Co., 31 Pa. Superior Ct. 524; Sears *v.* Trust Co., 228 Pa. 126.

Jurisdiction in equity depends not so much on the want of a common law remedy as upon its inadequacy, and its exercise is a matter which often rests in the discretion of the court: Bierbower's Appeal, 107 Pa. 14; Edison Co. *v.* Power Co., 253 Pa. 457; Lehigh Valley R. R. Co. *v.* Graham, 64 Pa. Superior Ct. 437.

The relief prayed for necessarily invokes the jurisdiction of the court of equity: Williams *v.* Finlaw, Mueller Co., 292 Pa. 244.

The existence of a statutory remedy which is not exclusive will not divest the jurisdiction of a court of equity: Hutchinson *v.* Dennis, 217 Pa. 290.

Injunction, we believe, is the proper remedy, for as late as 1927, in a case of transcendent importance from the standpoint of the value of the property involved (Lehigh & Wilkes-Barre C. Co. *v.* Pittston C. M. Co., 289 Pa. 492), the State Supreme Court recognized the availability and propriety of injunction for preventing the owner of land from collecting water coming on to his own premises and discharging it in bulk on to his neighbor's property. That the character of the property there owned was coal mines and the nature of the water collected and discharged, mine water, were wholly without significance.

Injunction was again recognized in Rielly *v.* Stephenson, 222 Pa. 252, as an available proceeding to restrain the unlawful discharge of water upon neighboring land. The fact that the injunction was denied on substantive legal grounds is immaterial as to the availability of the proceeding.

It is expressly averred in the bill that the injury threatened will be substantial, recurrent and irreparable, and the bill as a whole makes it apparent that no adequate remedy is available on the law side of the court.

We believe that the plaintiffs' bill establishes the substantive right to relief.

Three fundamental fallacies underlie defendant's answer; the first two fallacies of law, the third a fallacy of fact.

He interprets the law of the Commonwealth to be that because defendant's land is urban in character, defendant is free to develop his land to its full extent and, as a part of such development, to divert the natural course of water falling thereon, intensify the volume of the run-off, gather and collect it in artificial channels and discharge it on the lower contiguous land, the only qualification being against such developer's negligence.

Nothing could be farther from the status of the law. No owner of higher land, be it urban, farm, mine or otherwise, now has, or at any time in the history of this Commonwealth ever did have, the right to divert water from its natural flow, collect it in bulk and discharge it on the lower land. The distinction between urban and rural property—which is of modern origin only—is not one of broader rights in the owner of the *higher land*, but of the *lower land*. Under the civil law and early decisions of this Commonwealth, the owner of the lower land was without right to *turn back* water which came in its natural flow from higher contiguous land, and this is still the law as to rural property. This rule has been modified under present decisions with respect to urban land, and it is now held that the owner of such *lower* land is no longer required to accept the flow and that he can obstruct its entrance and turn it back on the higher land from which it comes, being responsible only for negligence. The modification of the rule, the elasticity in the modern status, is one solely in favor of the *lower* land. Nowhere in this State, at no time, now or heretofore, was there existent a right in the owner of the higher urban ground to divert, intensify and collect his surface or other water and cast it in bulk on the private property of others. The sole effect of urban

location is that he cannot now insist that the lower owner shall accept even the normal flow draining through natural channels. Urban location is significant only in the right to *obstruct* flow, but not in any right to *cause* flow. As to the latter, no right exists or ever existed in the law of the land. Urban location *restricts*, not enlarges, the rights of the higher owner. A few decisions only are necessary to demonstrate the foregoing.

Lehigh & Wilkes-Barre C. Co. *v.* Pittston C. M. Co., 289 Pa. 492:

An injunction issued against the collection of mine water and its discharge into the neighboring mine owned by another, and although mining land was placed in the rule as to rural land, the court held injunction should issue. The court, *inter alia*, said (page 497) : "The right to use land for agricultural or mining purposes in the useful and proper manner, although it may result in some additional flow of surface-water upon the land of an adjoining owner, is undoubted, *but the right to collect such water and to conduct it upon another's land through an artificial channel cannot be sustained.* While proper farming or mining may affect the flow of surface-water, yet when it departs it must be in a natural course and not collected together and cast upon lower land by artificial means: Kauffman *v.* Griesemer, 26 Pa. 407; Locust Mountain Coal and Iron Co. *v.* Garrell et al., *supra;* Strauss *v.* Allentown, 215 Pa. 96; Rielly *v.* Stephenson, 222 Pa. 252."

The judicial pronouncements in Rielly *v.* Stephenson, 222 Pa. 252, also hereinbefore referred to, are likewise in point, even though the party there seeking the injunction was the owner of the *higher* land and the injury complained against was the turning back of water by the lower owner. The modern rule as to rural land is thus expressed:

"The owners of lots in cities and towns buy and own with the manifest condition that the natural or existing surface is liable to be changed by the progress of municipal development. All such owners have equal rights, neither lessened nor increased by priority of improvement, and the primary right of each owner is to protect himself and his lot from loss or inconvenience from the flow of surface-water. The owner at the foot of the slope is under no obligation to allow his lot to continue as a reservoir for the surplus water of the neighborhood. He may shut it out by grading or otherwise, and the fact that thereby he may incidentally increase the flow on the adjoining lot neither makes him answerable in damages nor affects the adjoining owner's right in his turn to shut out the original, plus the increased flow on his lot. The owner cannot be coerced as to time or manner of improvement by risk of having put upon him the burden of providing for the flow upon others.

"Some things, of course, he may not do. He may not proceed negligently so as to do unnecessary damage to others. But, so far as he acts upon his right to protect his enjoyment of his own property, any incidental loss to his neighbor is *damnum absque injuria.* It is clearly settled, however, first, that he may not obstruct a natural channel for the flow of the water, or a channel that has acquired the character of an easement; *and, secondly, he may not gather surface-water into a body and discharge it on* the adjoining land. His right is to shut out the invading water, as a common enemy, for the protection of his own land."

Wilson *v.* McCluskey, 46 Pa. Superior Ct. 594 (1911), is another leading case having followed the Rielly case. The essence of this case was the shutting out of water and not the collecting of water and the casting it on to the land of another.

Defendant's 19th objection is predicated upon an assumption that plaintiffs are bound to exercise this right, and, hence, are outside the protection of equity. The law is the other way. The question was directly raised in Wilson v. McCluskey, 53 Pa. Superior Ct. 25, and it is held that an owner of a city lot is *not bound to protect himself from surface-water from his neighbor's land by the countervailing obstruction;* and, hence, that where an owner of a city lot with a building thereon deposits ashes and dirt on his own lot, but near to his neighbor's line, and eaves and water-spouts on his building are so constructed that the water from them carries the dirt and ashes on to the neighbor's land, he is liable in damages to his neighbor for the injury sustained, and in an action to recover such damages, the court cannot say *as a matter of law that it is his neighbor's duty to erect on his premises a countervailing obstruction.* . And see Gift v. City of Reading, 3 Pa. Superior Ct. 359, holding that in regulating the flow of surface-water on the streets, municipalities have no right to cast it upon adjacent property, and that water thus diverted must first pass over the intervening lands of others, will not affect the question of liability.

In Strauss v. Allentown, 215 Pa. 96, in holding that the municipality was not liable for increasing the flow of water on plaintiff's land due to the improvement, opening and establishment of streets, the court pointed out that (page 98): "The city had not diverted the water into any artificial channels and it flowed into plaintiff's tail-race as it had done before, because the race was the lowest point of the watershed." In other words, it was simply an increasing by the improvements of streets of the amount of water which was discharged upon the lower land. The natural flow of the water was in no wise changed, and, as the court was careful to point out, it was not gathered into artificial channels.

The Note to Gray v. McWilliams, 21 L. R. A. 593, beginning on page 595, collects the decisions of other states and establishes clearly as the rule that surface-water cannot be collected in artificial channels and precipitated in undue and unnatural quantities upon the lands of a neighbor.

Even a municipality is without power to divert the flow of water and cast it in bulk on private land. Thus, in Weir v. Plymouth Borough, 148 Pa. 566, it was held that a municipal corporation is liable for changing the natural course of surface-water on its streets and throwing it on the land of a private owner, and the consent of the owner of the land upon which the water is directly thrown does not constitute a defense if the water necessarily finds its way to the plaintiff's property and causes an injury thereon.

On liability of borough to property owner for dumping water on his land is Torrey v. City of Scranton, 133 Pa. 173; Weir v. Plymouth Borough, 148 Pa. 566; Bohan v. Avoca Borough, 154 Pa. 404; Matlack v. Callahan, 25 Pa. Superior Ct. 454.

Almost identical in its facts to the case at bar is Lion v. Baltimore City Passenger Ry. Co., 47 L. R. A. 127, wherein it was decided that the changing of accustomed flow of surface-water on a street and centralizing it in underground drains and a vault, where but part of the water had flowed on the surface, is done at the peril of providing adequate means to discharge the water so gathered and to discharge it in a way that will not be injurious to others; and that the employment of a competent engineer to direct the work is not the fulfillment of a duty to avoid injury to another, when, notwithstanding the engineer's competency, the work as constructed does cause the injury.

Defendant's second fallacy of law is that he has the right to employ the public highways as a conduit for the water collected from his property, and

implies in paragraph 10 of the answer that if the borough has not constructed the road with drains, etc., to carry off the water, that that is no fault of the defendant. By paragraph 22 it is contended that defendant's liability ceased when he dumped the water into the borough street, and that if plaintiffs have been damaged, their recourse is against the municipality. Such a legal position was judicially rejected as early as Martin *v.* Riddle, in 26 Pa. 415 *n.* It there appeared that for a long time there had been a culvert underneath the road which separated lands of the plaintiff and defendant through which the natural flow had been discharged across said road into the channel aforesaid. It became choked up from neglect and the authorities of the Borough of Manchester, at the instance of the plaintiff and others, had built a new culvert in its place. After this, the amount of water flowing through said channel was greatly increased in time of storms by means of a road cut into the hill by an adjoining proprietor (a cemetery company), which collected into one drain and thence into this channel large quantities of water which had been previously discharged in a natural way over a large surface. This increase of water did great injury to the defendant, and to protect himself therefrom he stopped up the culvert and thus threw the water back upon the road on the plaintiff's side of it, overflowing his land and interfering with his garden operation. Defendant undertook to justify his act by advancing as a legal proposition that when he had dumped the water on the road, it became the burden of the municipality to care for it. This proposition was rejected by the court in the following language: "Nor can the defendant justify himself by saying that he only turned the water upon the road and that it was the duty of the authorities of Manchester to provide means for carrying it off. A road is a way for travel, not for water; and it would be ruinous to our public roads if each adjoining proprietor could insist upon discharging the drainage of his land upon them or preventing the roads from being drained upon his land. Roads are made for the convenience of travel, and in no sense to relieve land bordering upon them from the burdens to which they are naturally subservient. When there is a natural channel or hollow for discharging the flow of water, it must be suffered to remain until altered by agreement of those concerned, and the water cannot be turned upon the road until the proper authorities have provided means of carrying it away: Corp. J. C. Dig., 39, 3, 181."

In Lorah *v.* Amity Township, 35 Pa. Superior Ct. 529, it appeared that the supervisors had opened drains alongside of a public road, and waters which naturally flowed from the land on to the land adjoining were carried off by the drain, and this condition of things existed for many years. A subsequent board of supervisors closed up the drain and again diverted the water on to the neighboring land. It was contended by the abutting property owner that the ditch alongside the road was an open watercourse for his benefit and with which the municipal authorities could not interfere, concerning which the court said (page 533): "*The plaintiff never acquired a right to use the road as a conduit to carry the water from his premises.* 'Roads are made for convenience of travel and in no sense to relieve land bordering upon them from the burdens to which they are naturally subservient:' Martin *v.* Riddle, 26 Pa. 415 *n.* The non-suit was right to be granted."

"Defendant's comprehensive plan (which) contemplates the effective drainage of his lots into the abutting streets and highways," as stated in paragraph 13 of the answer, and dumped on to and along the borough thoroughfare to sweep itself and its accompanying debris on to plaintiffs' land is an *unlawful* plan, and the attempt to slip out of responsibility by discharging the

flow on a municipal highway is a futility. It is *private flow,* notwithstanding it is directed on to a *public* highway.

Moreover, the complainants do not aver that all the water discharged from the vault runs *down and altogether on* the street, but aver that the water runs not only "*on*" but "*along*"—that is, "*nearby*"—the street and on to plaintiffs' land. (See paragraph 13 of the bill and paragraph 2 of the prayers for relief, and paragraph 18 avers a diversion and unlawful additional drainage way for defendant's water directly on to plaintiffs' property.) It nowhere appears or is properly inferable from the bill that this drain of defendant is but a temporary expedient (see paragraph 13 of the answer), and equity will not concern itself as to whether it is or not.

The third major fallacy of defendant's answer—one of fact, as before stated—is its assumption that defendant's water so directed, collected and discharged is carried into the open watercourse through plaintiffs' land; that said watercourse is the natural course for defendant's water and that the damages averred ensue from plaintiffs' failure to provide sufficient outlet from his dam or pond. (See paragraph 16 of answer.)

The averments of the bill are that defendant diverted, collected, bulked and discharged water *not into the watercourse,* but that it flows and is discharged "*into, on and over* plaintiffs' said premises." (See paragraphs 13, 14, 16 and 18 of the bill.)

Nowhere from plaintiffs' bill is it properly inferable that the damage results from a *backing up* of water from plaintiffs' pond. It is properly inferable from the bill that the water flows in bulk on to plaintiffs' land without going into the watercourse at all and that the quantity which gets into the watercourse is more than its size will accommodate. See Mason *v.* Fulton County Comm'rs, 24 L. R. A. (N. S.) 903. It appears from the bill that the water dumped on to plaintiffs' land is water *much of which is diverted from its natural flow.* Open watercourses through the lower owner's land can never be adversely used with legal countenance for such character of drainage: Manteufel *v.* Wetzel, 19 L. R. A. (N. S.) 167.

It is not necessary, in order for relief to plaintiffs, that they show defendant's improvements were constructed in a careless or negligent way. Regardless of the degree of care employed, defendant's water cannot be diverted, collected and cast in bulk on plaintiffs' premises. Lion *v.* Baltimore City Passenger Ry. Co., 47 L. R. A. 127, is the complete answer, [a case in which it was held] that even the employment of a competent engineer to direct the work [is no defense], when, notwithstanding his competency, the work as constructed does cause the injury. The averments of the bill as to defendant's acts and the resultant injury to the plaintiffs' premises are sufficient allegations as to the impropriety and unreasonableness of defendant's action.

"The lack of public storm sewers creates no right in defendant to use the public highway as conduits for its water. Indeed, such lack is a definite inhibition to defendant against its use:" Martin *v.* Riddle, 26 Pa. 415 *n.* Nor does the bill aver that the water discharged on said road drains into the creek or rivulet, but, on the contrary, that they are discharged in such bulk from the road on to, in and over plaintiffs' land.

Nowhere in the bill is there any averment from which an inadequacy of plaintiffs' outlet pipe for the capacity of the open watercourse is inferable. This objection of inadequacy constitutes "extraneous matter" which cannot be considered: Paris *v.* Reichard, 10 D. & C. 165, and Wettengel *v.* Robinson, 74 Pitts. L. J. 325.

Plaintiffs are under no obligation to erect countervailing obstructions to the flow: Wilson *v.* McCluskey, 53 Pa. Superior Ct. 25, *supra.*

The irreparable injury and disproportionate hardship represented in the 20th objection is irrelevant. The water complained against is not a "natural increase of surface-water attendant upon the orderly growth and development of the Borough of Swarthmore and reasonable improvements being made by defendant on his premises." Defendant cannot develop his land at the injury or destruction of the plaintiffs'. The orderly growth and development of the borough has nothing to do with the case, except its bearing on the right of the plaintiffs to shut out defendant's water if they choose and if it can be practically done, but this plaintiffs are not required to do in order to get equitable relief. Defendant's concept that because his property is located in a borough he can develop it as he pleases, and divert, collect and dump water in bulk on a municipal highway, not constructed to receive it, or along the highway, to the injury of another's land, is a fallacy.

The decisions above quoted demonstrate injunction as the proper remedy, and allegations of irreparable, recurrent and continuing damage demonstrate the absence of adequate legal remedy.

The damage threatened in the bill is not due to any act of the borough, but is due to defendant's unlawful attempt to employ the municipal highway as a private conduit for his surface-water; and, moreover, the bill plainly avers that the water from said vault runs not only down on plaintiffs' premises from the highway, but also from *along* the highway.

From a careful perusal of the bill in equity, and we must confine ourselves to the averments thereof and not consider extraneous matters, we are of the view that the defendant has changed the flow of the surface-water, not such change as is a consequence of the gradual and ordinary development of rural into urban property, but that the defendant has diverted water in such a fashion as to compel it to flow on to the plaintiffs' premises as it had never done before; that is to say, an excessive flow and more than the ditch or stream or watercourse could ordinarily handle. True it is that the doctrine is that surface-water is a common enemy which every proprietor may fight to get rid of as best he may, and the same principle applies to individuals as well as municipalities, but that doctrine is not applicable here, as the averments of the bill warrant the conclusion that the water would have flowed, unless these radical changes had been made, upon the plaintiffs' premises as the servient tenement without damage to plaintiffs had it not been for the erection of the storm sewer and other receptacles to receive the water from the defendant's premises, then discharging it in large volume eventually on plaintiffs' premises to his detriment, prejudice and damage. An individual is just as liable as a municipality when the flow of surface-water is so diverted that it accumulates and flows upon abutting property, where it would not flow naturally, and, therefore, is liable to abutting owners in damages for the resulting injury: Meninchino *v.* City of New Castle, 96 Pa. Superior Ct. 405; Rohrer *v.* Harrisburg, 20 Pa. Superior Ct. 543; Torrey *v.* Scranton, 133 Pa. 173; Woolheater *v.* Mifflin Township, 74 Pa. Superior Ct. 557.

We have carefully noted the case of Tess *v.* Charleroi Home Building Co., 96 Pa. Superior Ct. 505, but the facts of this case are different.

### Conclusion.

It plainly appears defendant's objections are totally devoid of merit. The preliminary objections should be dismissed and defendant required to answer

over, under penalty of having the bill taken *pro confesso;* therefore, we make the following

### Decree.

And now, Nov. 1, 1929, the above matter coming on to be heard by the court *in banc* upon bill of complaint, answer raising preliminary objections, oral arguments and briefs, after due consideration, it is ordered, adjudged and decreed that the preliminary objections be and are hereby dismissed and defendant required to answer over, under penalty of having the bill taken *pro confesso.*

From William R. Toal, Media, Pa.